Eugene KNOP, Christopher Knop, Jerome Knop, Daniel Knop and Eric Knop, Appellants,

v.

BI–STATE DEVELOPMENT AGENCY OF THE MISSOURI–ILLINOIS METROPOLITAN DISTRICT, Respondent.

No. 74541.

Missouri Court of Appeals, Eastern District, Division One.

March 30, 1999.

Robert L. Hughes, St. Louis, for appellants.

Denis C. Burns, St. Louis, for respondent.

WILLIAM H. CRANDALL, Jr., Presiding Judge.

Plaintiffs, Eugene Knop, Jerome Knop, Christopher Knop, Daniel Knop, and Eric Knop, appeal from the trial court's grant of summary judgment in favor of defendant, Bi–State Development Agency of the Missouri–Illinois Metropolitan District (hereinafter Bi–State), in plaintiffs' action for the wrongful death of their mother after a shooting in a garage operated by Bi–State. We affirm.

The facts in the record established that on August 5, 1993, Alice Knop, plainitffs' mother (hereinafter decedent), was shot to death in a parking garage in downtown St. Louis (hereinafter garage). The garage was part of 93 acres comprising the Jefferson National Expansion Memorial grounds on which the St. Louis Arch was located (hereinafter Arch grounds). The garage was located at 100 Washington Avenue. The garage had three parking levels: the roof level which was adjacent to and level with the Arch grounds; the middle level with an entrance from Washington Avenue; and the bottom level with an exit farther east on Washington Avenue. The middle level entrance was unattended, but a machine dispensed tickets to incoming vehicles. The bottom level had an attendant to take the parking fees from exiting vehicles. The garage was lighted and remained open 24 hours a day, seven days a week. The garage was not enclosed and was acces-

sible on all levels, with open stairways connecting all levels.

At all times pertinent to this litigation, the government of the United States of America (U.S.) owned both the garage and the Arch. Bi–State operated the Arch train, facilities located underneath the Arch, and the garage. Pursuant to a contract entered into with Bi–State on October 15, 1992, the National Park Service of the Department of the Interior of the U.S. government (hereinafter Park Service) agreed to provide security and maintenance for the garage. The agreement required at least one law enforcement officer to patrol the garage on foot 24 hours a day, seven days a week. The Park Service also provided security for the Arch grounds. Bi–State employees staffed the garage and collected the parking fees. Video surveillance cameras were in place on the garage's stairs and entrance and monitoring televisions were located in Bi–State's office. The cameras were not operating at the time of the incident.

On the day of the shooting, decedent was a passenger in an automobile driven by another individual. The driver entered the garage about 10 p.m. and parked the vehicle near the entry gates. Before decedent and the driver exited the vehicle, a man appeared at the passenger side of the vehicle. Displaying a gun, he demanded money. Although decedent and the driver gave him their money, the robber fired multiple gunshots into the vehicle, killing decedent.

Plaintiffs, decedent's children, brought an action for wrongful death against Bi–State. In their petition, they alleged that Bi–State was negligent in that it knew or should have known that the "garage was a dangerous place frequented by individuals prone to violent criminal conduct where prior violent crimes had often occurred" and that Bi–State had failed to provide adequate security to protect parkers from these criminals. They further alleged that Bi–State failed to maintain or monitor audio and video surveillance devices.

Bi–State moved for summary judgment, submitting affidavits, exhibits, and deposition testimony. Bi–State contended it owed no duty to decedent to protect her from the criminal acts of third parties (1) because the Park Service agreed to provide security in the garage owned by the U.S. and (2) because there was an absence of prior, similar violent crimes in the garage. The trial court granted summary judgment in Bi–State's favor. The court found that Bi–State "maintained and operated the garage under agreement with the U.S." It further found that the statistics presented by the plaintiffs showed a lack of violent crimes in the garage itself.

Plaintiffs filed a motion to reconsider, claiming an armed robbery had occurred on July 10, 1991, in the garage and a strong armed robbery had occurred on June 5, 1993, on the sidewalk in front of the garage on the Arch grounds. They submitted police reports to substantiate these occurrences. In its motion in opposition to the motion to reconsider, Bi–State countered that both criminal acts took place not in the garage but on the Arch grounds, one over 500 feet from the garage and the other even farther from the garage. Affidavits signed by the victims of these crimes confirmed these assertions. The trial court denied plaintiffs' motion to reconsider.

When considering appeals from summary judgments, we review the record in the light most favorable to the non-movant, and give that party the benefit of all reasonable inferences. *ITT Commercial Finance v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). A party moving for summary judgment "bears the burden of establishing a right to judgment as a matter of law on the record as submitted; any evidence in the record that presents a genuine dispute as to the material facts defeats the movant's prima facie showing." *Id.* at 382. "Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion." *Id.* at 376. Appellate review is essentially de novo. *Id.* A trial court's entry of summary judgment will be affirmed if it is sustainable as a matter of law on any ground. *Atlas Intermodal Trucking Serv., Inc. v. United Fire & Casualty Co.*, 973 S.W.2d 174, 177 (Mo.App. E.D.1998).

Plaintiffs' action was predicated on two theories regarding the breach of Bi–State's duty to protect decedent: first there was a duty imposed upon Bi–State to protect decedent because of the occurrence of prior violent crimes in the garage; and second Bi–State assumed the duty to protect decedent. With regard to the first theory, plaintiffs argued the incidences of prior violent crimes in the garage and on the adjacent Arch grounds imposed a duty on Bi–State to protect decedent from like crimes perpetrated by unknown assailants.

■ To recover for Bi–State's negligence, plaintiffs must establish the elements of a negligence claim—duty, breach of duty, causation, and damages. *Schelp v. Cohen–Esrey Estate Services Inc.*, 889 S.W.2d 848, 850 (Mo.App. W.D.1994). At issue in the instant action is whether Bi–State had a duty to protect decedent from a third party's criminal attack.

■ The existence of a duty is purely a question of law. *Aaron v. Havens*, 758 S.W.2d 446, 447 (Mo. banc 1988). Generally, one person owes no duty to protect another from a deliberate criminal attack by a third person. *Faheen, by and through Hebron v. City Parking Corp.*, 734 S.W.2d 270, 272 (Mo.App.1987). Policy reasons for refusing to impose such a duty include:

[J]udicial reluctance to tamper with a traditional, common law concept; the notion that a deliberate criminal act of a third person is the intervening cause of harm to another; the difficulty that often exists in determining the foreseeability of criminal acts; the vagueness of the standard the owner must meet; the economic consequences of imposing such a duty; and conflict with the public policy that protecting citizens is the government's duty rather than a duty of the private sector.

*Id.* Despite this rule, the law recognizes some obligations of a person to protect another against a deliberate criminal attack by a third person. *Id.*

■ Exceptions to the general no-duty rule arise, *inter alia*, from "special relationships" or from "special facts and circumstances," such that an act or omission exposes a person to an unreasonable risk of harm through the conduct of another. *Schelp*, 889 S.W.2d at 850–851. "Special relationships" include those situations where a party entrusts himself or herself to the protection of another and relies upon that person to provide a place of safety. *Schelp*, 889 S.W.2d at 851. The "special facts and circumstances" exception includes two theories: (1) an intentional infliction of injury by known and identifiable third persons; or (2) frequent and recent occurrences of violent crimes against persons on the premises by unknown assailants. *Id.*

■ In the case before us, plaintiffs rely on the "violent crimes" exception and assert that recent, prior incidents of similar violent crimes in or in close proximity to the garage put Bi–State on notice that there was a likelihood that third persons might endanger the safety of garage patrons. Under the "violent crimes" exception, a duty is imposed only if several elements are present: (1) there must exist some relationship between the plaintiff and the defendant which encourages the plaintiff to come on the premises; (2) there must be prior specific incidents of violent crimes on the premises that are sufficiently numerous and recent to put a defendant on actual or constructive notice that there is a likelihood third persons will endanger the safety of invitees; and (3) the incident causing the injury to the plaintiff must be sufficiently similar in type to the prior specific incidents occurring on the premises that a reasonable person would take precautions to protect his or her invitees against that type of activity. *Groce v. Kansas City Spirit, Inc.*, 925 S.W.2d 880, 884 (Mo.App. W.D. 1996) (citing *Faheen*, 734 S.W.2d at 272–274).

■ Here, neither party contests that there was a relationship between decedent and Bi–State that encouraged her to enter the garage. To prevail, plaintiffs must establish prior specific incidents of violent crimes on the premises that were sufficiently recent, numerous, and similar to the crime perpetrated against decedent to put Bi–State on notice that there was a likelihood that third persons would endanger the safety of decedent. *See, e.g., Wood v. Centermark Properties, Inc.*, 984 S.W.2d 517, 522 (Mo.App. E.D.

1998). It is not necessary that prior crimes be identical to the crime against decedent, but the nature of the criminal acts must share common elements sufficient to place Bi–State on notice of the danger and alert it to the safeguards that are appropriate to the risks. *Keesee v. Freeman*, 772 S.W.2d 663, 669 (Mo.App.1989).

■ In the instant action, the trial court found that the crimes presented by plaintiffs as evidence of prior violent crimes were not sufficiently similar to warrant imposing a duty upon Bi–State to protect invitees. The court found that no prior violent crimes had occurred in the garage and that crimes occurring on the entire Arch grounds did not invoke the duty because they didn't occur on the garage premises. Violent crimes are defined as "assaults, robberies, murder, rape, things such as that, that require some attempt at bodily harm or bodily harm together with whatever else may have occurred, such as a robbery." *Brown v. National Super Markets, Inc.*, 731 S.W.2d 291, 294 (Mo. App.1987). Also, to be considered under the violent crimes exception, the incident must occur on premises controlled by the defendant. *Keenan v. Miriam Foundation*, 784 S.W.2d 298, 303 (Mo.App.1990).

The record before us established that one strong armed robbery took place in the garage in 1989. Plaintiffs also alleged that one armed robbery occurred in the garage in July 1991 and another armed robbery occurred on the sidewalk next to the garage in June 1993; and submitted police reports supporting these allegations. Bi–State, however, submitted the affidavits of the actual victims of these crimes to establish that neither crime occurred in the garage or in close proximity to the garage. Even assuming there was at least an issue of fact as to whether crimes occurred in or near the garage, two armed robberies over a two-year period and a strong armed robbery four years earlier were not sufficient, as a matter of law, to put Bi–State on notice of the danger of decedent being robbed at gunpoint and killed.

In cases where a duty was found under the violent crimes exception, courts have found numerous, prior crimes with a high degree of force, usually involving the use of a weapon. *See, e.g., Madden v. C & K Barbecue Carry-out, Inc.*, 758 S.W.2d 59, 62 (Mo. banc 1988) (six strong armed robberies, six armed robberies, one assault, and one purse snatching sufficient to establish a duty to protect plaintiff against the attack of an unknown assailant on the parking lot who forced his way into plaintiff's car at gunpoint, kidnapped her, and after driving to another location physically and sexually assaulted her); *Decker v. Gramex Corp.*, 758 S.W.2d 59, 63 (Mo. banc 1988) (decided with the *Madden* case, five armed robberies, four purse snatchings, robbery second degree, attempted armed robbery, assault, assault with a deadly weapon, stealing, and attempted purse snatching sufficient to establish a duty to protect spouses from the attack of two unknown assailants who forcibly abducted them from a parking lot and then murdered them, in addition to raping and sodomizing wife); *Brown v. National Supermarkets, Inc.*, 679 S.W.2d 307, 309–310 (Mo.App.1984) (sixteen robberies involving a firearm, seven strong armed robberies, and 136 other crimes over a two year period gave rise to duty to protect plaintiff who was assaulted, battered, and shot by an unknown assailant on a parking lot). Conversely, this court has refused to impose liability where the prior crimes did not share common elements with the crime at issue sufficient to put the defendant on notice of the danger to the victim. *See, e.g., Wood*, at 522 (nine assaults, five purse snatchings, one robbery, one robbery-holdup with the possible use of a weapon, one fight, two strong armed robberies, and an incident where a youth attempted to run over a mall employee not sufficient to put defendant on notice that Wood would be abducted at gun point from a mall parking lot and then killed); *Faheen*, 734 S.W.2d at 271–272 (arson, assault, robbery, burglary, stealing, and various misdemeanors, the majority of which were crimes against property, were not sufficient to put defendant on notice of the risk of murder and car bombing of Faheen in the parking garage).

■ Plaintiffs urge us to expand the concept of premises to include the entire Arch grounds, with the result that violent crimes

occurring anywhere on the Arch grounds could be considered for the sole purpose of invoking the violent crimes exception. We are mindful of the language in *Faheen*, regarding the imposition of a duty on the owner of property under the violent crimes exception:

> [C]rime is foreseeable in our society, any place, anytime. The fact that crimes in general have occurred in an area or that a business is located in a "high crime" area is insufficient to invoke the duty.... [A]lthough the case law and comments use terms such as "foreseeability," "proximate cause," and "intervening cause," the final resolution of the issue is dictated by basic fairness and public policy.

*Faheen*, 734 S.W.2d at 273 (citation omitted). Any reference in *Faheen* to crimes occurring off the premises of the parking garage was the result of this court's summarizing the pleadings in which the plaintiff pleaded crimes that had occurred in the entire apartment complex and not just in the parking garage of the apartment building. *Id.* at 274. In the context of the violent crimes exception, we decline to expand the premises in the instant action to include the entire Arch grounds.

Bi–State also contested its occupation and control of the garage, with the result that it had no duty to protect decedent under the violent crimes exception. In view of our holding that the prior crimes proffered by plaintiffs were not sufficient to invoke the violent crimes exception, the issue of whether Bi–State controlled the garage is rendered moot.

■ Plaintiffs' second theory of recovery is that Bi–State assumed a duty to protect decedent. "From the earliest days of the common law, it has been recognized that a duty may be assumed or undertaken, and when so assumed, the defendant must exercise reasonable care." *Keenan*, 784 S.W.2d at 303. In *Keenan*, the plaintiff was the victim of an armed robbery which occurred while she was donating some items to the Miriam Foundation (hereinafter Foundation). *Id.* at 300. Plaintiff lived about two blocks from the Foundation which was located in an area known as a high crime area. *Id.* She originally went to the front of the Foundation's resale shop, but an employee told her to go to the back where someone would unlock the gate and help her unload her vehicle. *Id.* When plaintiff expressed concern about going to the back of the building because of the "character" of the neighborhood, the employee assured her that she would be safe and that someone would meet her in the back to protect her. *Id.* at 300. This court reasoned that under those circumstances, the Foundation assumed the duty to protect the plaintiff. *Id.* at 304. This court noted that the Foundation directed and invited her into an area that it claimed was safe and that the Foundation undertook a duty to provide a secure area and made representations that the location where the attack occurred was a secure area. *Id.* at 304.

The case before us is distinguishable from *Keenan*. In *Keenan*, the Foundation personally invited and directed the plaintiff to the area where she was attacked. In contrast, plaintiffs presented no evidence, by affidavit or otherwise, that Bi–State took any affirmative action that directed decedent to park in the garage. Also, in *Keenan*, the plaintiff was personally assured that she would be protected. Here, plaintiffs presented no evidence, by affidavit or otherwise, that Bi–State assumed a duty by affirmatively undertaking to assure decedent's safety in the garage. *See id.*

■ Further, Bi–State did not assume a duty to protect decedent merely because it contracted for security to be provided in the garage. The provision of a security force, which has the policy of patrolling the premises, does not create an assumed duty. *Wood*, at 522. In addition, in the instant action, Bi–State entered into an agreement with the U.S. for the Park Service to provide security for the garage which was owned by the U.S. Bi–State thus never assumed the duty to protect decedent on property it didn't own when it agreed with the owner for the owner to provide the security.

Bi–State had no duty, either imposed as a result of prior violent crimes or assumed because of its conduct, to protect decedent from attack by an unknown assailant in the

garage. Because Bi–State had no duty as a matter of law to safeguard decedent, the trial court did not err in granting summary judgment in favor of Bi–State.

The judgment of the trial court is affirmed.

KENT E. KAROHL, J., and CLIFFORD H. AHRENS, J., Concur.